*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0494**

S.F.,
Appellant,

vs.

Clay County, et al.,
Respondents.

**Filed December 8, 2014
Reversed and remanded
Stauber, Judge**

Clay County District Court
File No. 14-CV-13-2095

Robert J. Udland, Vanessa Lynn Anderson, Vogel Law Firm, Fargo, North Dakota (for appellant)

Chad R. Felstul, Kristi A. Hastings, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, Minnesota (for respondents)

Considered and decided by Kirk, Presiding Judge; Hudson, Judge; and Stauber, Judge.

## UNPUBLISHED OPINION

**STAUBER**, Judge

Appellant challenges the summary-judgment dismissal of her claims of violations of the Minnesota Government Data Practices Act (the MGDPA) and the Minnesota Health Records Act (the MHRA), arguing that the district court erred by determining that

(1) the county's use of a child-welfare report to terminate appellant's employment was proper because the report was both personnel and welfare data and (2) the county's use of appellant's medical record was proper because the report was mandated by law. We reverse and remand.

## FACTS

On June 25, 2012, appellant S.F. began working for respondent Clay County Social Services (the county) as a social worker with disabled children and adults. Shortly before she began working for the county, S.F. learned that she was pregnant. On August 1, 2012, S.F. had her first obstetrics appointment at a clinic in Cass County, North Dakota. During this appointment, she confided to her nurse that she had used marijuana daily but she ceased using it once she learned that she was pregnant. Under North Dakota law, the nurse was required to report maternal prenatal drug usage. The nurse filed a "Report of Suspected Abuse or Neglect" with Cass County in North Dakota. Cass County learned that S.F. lived in Clay County, Minnesota, and forwarded the report to the county for "review and intervention."

The county receptionist recognized the name on the referral as a possible county employee and forwarded the report to the child-protection unit supervisor, Stacy Christensen. Christensen contacted Rhonda Porter, director of the Clay County Social Services Unit. Porter and Christensen decided that the county had a conflict of interest and referred the report to Otter Tail County for investigation. Otter Tail County did an initial screening and determined that no child-protection investigation was required and

2

returned the report to the county with a recommendation that the county do a child-welfare assessment. Christensen sent the report to Becker County to do the assessment.

In addition to Christensen, Porter discussed the North Dakota report with Laurie Young, S.F.'s immediate supervisor, who recommended taking no action on her employment. Darren Brooke and Jennifer Pierson of the county human resources department, county attorney Brian Melton, assistant county attorney Michelle Lawson, and county administrator Brian Berg were also advised of the report, and different options as to S.F.'s continuing employment were considered.

On August 10, S.F. failed to record her whereabouts on the SharePoint site, as she was required to do. When she returned to the office, Porter terminated her employment, telling her that she was "not a good fit." No other explanation was provided. During her deposition, Porter testified that S.F.'s "engaging in a criminal activity on a daily basis" was "absolutely" the main factor in her termination. The source of this information was the initial North Dakota child abuse/neglect report.

S.F. filed a union grievance, alleging that she was terminated because of her pregnancy. As part of this, she requested her personnel file, but the child abuse/neglect report was not in this file because it was being held in Porter's office. During the grievance process, the county defended itself by saying that it had not terminated S.F. because of her pregnancy, but because she was an at-will employee and "even if cause was required, [S.F.] was dismissed due to a child protection report received by Clay County Social Services that [S.F.] 'admits to daily usage of marijuana.'"

S.F. sued the county, alleging violations of the MGDPA and the MHRA. Both parties moved for summary judgment. The district court granted summary judgment to the county, holding that the child abuse/neglect report was both "welfare data" and "private personnel data" under the MGDPA, and because of this dual nature, the county's use of the data to terminate S.F.'s employment was permissible. The district court further found that the child abuse/neglect report was a medical record for purposes of the MHRA, but that the release of S.F.'s medical record to the county was permitted because of the mandated reporting requirement and the county had a "lawful right to disclose information to the union board" during the grievance proceeding. The district court concluded that the county had not violated the MGDPA or the MHRA and ordered S.F. to pay $200.00 in court costs and $578.00 in disbursements. This appeal followed.

## D E C I S I O N

We review the district court's summary judgment to determine whether there are genuine issues of material fact and whether the district court erred in its application of the law. *Dahlin v. Kroening*, 796 N.W.2d 503, 504-05 (Minn. 2011). This is a de novo review. *Riverview Muir Doran, LLC v. JADT Dev. Grp., L.L.C.*, 790 N.W.2d 167, 170 (Minn. 2010).

S.F.'s complaint alleged violations of the MGDPA, Minn. Stat. §§ 13.01-.90 (2012) and the MHRA, Minn. Stat. §§ 144.291-298 (2012). The county's discussions about the probationary aspect of S.F.'s employment and whether or not she was a satisfactory employee are not relevant to these claims; the complaint allegations concern only the handling of data.

4

**I.**

The district court found that the abuse/neglect report qualified as both welfare data and personnel data under the MGDPA. The MGDPA governs the dissemination of "government data," which is defined as "all data collected, created, received, maintained or disseminated by any government entity." Minn. Stat. § 13.02, subd. 7. "The purpose of the MGDPA is to balance the rights of individuals (data subjects) to protect personal information from indiscriminate disclosure with the right of the public to know what the government is doing." *Demers v. City of Minneapolis*, 468 N.W.2d 71, 72 (Minn. 1991). Data on individuals (natural persons) are confidential, private, or public; these classifications govern who has access to the data. Minn. Stat. § 13.02, subds. 3, 12, 15.

S.F.'s data-practices claim involves the interplay between different sections of the MGDPA. Statutory construction is a question of law, subject to de novo review. *Lee v. Lee*, 775 N.W.2d 631, 637 (Minn. 2009). If the meaning of a statute is clear and unambiguous, it is interpreted according to its plain language. *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn. 2010). If a statute is ambiguous because it is subject to more than one reasonable interpretation, it must be read and construed as a whole in light of the surrounding sections in order to avoid conflicting interpretations. *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000).

Minn. Stat. § 13.43 governs the use of personnel data. "Personnel data" are defined as "government data on individuals maintained because the individual is or was an employee of . . . a government entity." *Id.*, subd. 1. Certain personnel data are public and may be accessed by the public; generally, these data involve matters associated with

government employment: salary, pension, benefits, job titles, dates of employment, work contact numbers, and disciplinary actions. *Id.*, subd. 2. The statutory language suggests that "the existence and status of any complaints or charges against the employee" and "the final disposition of any disciplinary action" refers to events associated with employment. *Id.*

Minn. Stat. § 13.46 governs the use of "welfare data." The "welfare system" includes the Department of Human Services and local social services agencies, such as the county. *Id.*, subd. 1(c). "Data on individuals collected, maintained, used, or disseminated by the welfare system are private data on individuals, and shall not be disclosed" to the public except in certain circumstances. *Id.*, subd. 2. Welfare data can be exchanged between "personnel of the welfare system working in the same program." *Id.*, subd. 2(7). Medical data within the welfare system are private data on individuals. *Id.*, subd. 5.

Personnel data includes all data maintained on an individual because the individual is an employee of a government entity. Minn. Stat. § 13.43, subd. 1. Although at least superficially the abuse/neglect report was "maintained" because S.F. was a government employee, the report did not involve aspects of employment. Under the district court's broad reading of the definition of "personnel data," any information generated anywhere about anything concerning a government employee, so long as it comes to the attention of the government, would be personnel data.

Ordinarily, the abuse/neglect report, an example of welfare data, would not be available to the employer of the subject of the data. Here, the county collected,

6

maintained, and used the report because S.F. was a government employee, despite the fact that the report did not concern her employment terms or employment conduct. Although the county argues that "no provision of the MGDPA . . . supports [S.F.'s] position that the data at issue was solely welfare data," no provision of the MGDPA specifically clarifies what must happen when use of data conflicts with the two primary purposes of the MGDPA: "to balance the rights of individuals (data subjects) to protect personal information from indiscriminate disclosure with the right of the public to know what the government is doing." *Demers*, 468 N.W.2d at 72. The county argues that the public's right to know what the government is doing makes S.F.'s obstetric information public; S.F. asserts that the private nature of the welfare report trumps the public nature of the report as personnel data. To this extent, the statute is ambiguous, and we must apply principles of statutory construction.

We are guided by other sections of the MGDPA, which emphasize the private nature of certain data. Section 13.05 sets forth certain restrictions on the use and dissemination of private data on individuals, limiting it to "that necessary for the administration and management of programs specifically authorized by the legislature or local governing body or mandated by the federal government." *Id.*, subd. 3. The subject of the data must be informed of the purpose for the data collection and of which persons or agencies are authorized to receive the data; and the use of the data is limited to the purpose disclosed to the individual at the time of collection.[1] *Id.*, subd. 4; Minn. Stat.

---

[1] The report made here was governed by North Dakota law and is not covered by this provision.

§ 13.04, subd. 2. The purpose of the mandated abuse/neglect report is to ensure that an unborn child is not harmed and that a parent is assessed and counseled to protect the child. *See* Minn. Stat. §§ 626.556, .5561 (2012) (stating explicitly and implicitly that the purpose of these mandated-report statutes is to encourage protection of children's health and welfare). These statutory sections do not mandate a report in order to assist an employer in making employment decisions.[2]

We also observe that Minn. Stat. § 626.556, which governs reporting of child maltreatment and defines neglect to include "prenatal exposure to a controlled substance . . . used by the mother for a nonmedical purpose," includes a restriction on the use of a neglect/abuse report: "[w]here an investigation results in no determination of maltreatment or the need for child protective services, the assessment or investigation records . . . may not be used for employment, background checks, or purposes other than to assist in future risk and safety assessments." *Id.*, subds. 2(f)(6), 11c. The county argues that subdivision 11c does not apply to prenatal-drug-use reports made under section 626.5561, which references a list of other subdivisions of section 626.556 that do apply. But section 626.556 includes prenatal exposure to illicit controlled substances within the definition of neglect, and we see no reason to distinguish between reports of prenatal drug exposure made before and after birth.

---

[2] In fact, under Minnesota law, a health-care professional is exempt from reporting prenatal exposure to illicit controlled substances "if the professional is providing the woman with prenatal care or other healthcare services." Minn. Stat. § 626.5561, subd. 1(b).

For these reasons, we conclude that the district court erred by determining that the abuse/neglect report was both personnel and welfare data, and we hold that it was improper for the county to use the report for a personnel matter. We therefore reverse the district court's summary judgment and remand for further proceedings consistent with this opinion.

**II.**

S.F. argues that the district court erred by granting summary judgment to the county on her claim that the county violated the MHRA. In her complaint, S.F. alleged that the county violated the MHRA by permitting county employees to view and use the abuse/neglect report for a purpose other than that for which it was created.

The MHRA governs the release and disclosure of health records. Minn. Stat. § 144.293, subd. 1. The parties agree that the abuse/neglect report is a health record, defined as "any information . . . that relates to the past, present, or future physical or mental health or condition of a patient." Minn. Stat. § 144.291, subd. 2(c).

Health records may be released if (1) a patient has consented in writing to release of the records; (2) there is specific legal authorization for release of the records; or (3) a provider has a signed release from the patient authorizing release. Minn. Stat. § 144.293, subd. 2. In this case, there are specific laws in both North Dakota and Minnesota authorizing release of the health record to a county social-services agency for purposes of investigating and assessing abuse or neglect. *See* N.D. C. C. § 50-25.1-19; Minn. Stat. § 626.5561. The North Dakota statute specifies that the report should be forwarded to a child-protection agency for assessment and services. The Minnesota statute provides that

9

a local welfare agency must "immediately conduct an appropriate assessment and offer services indicated under the circumstances." Minn. Stat. § 626.5561, subd. 2.

In *Bol v. Cole*, 561 N.W.2d 143, 145 (1997), the supreme court considered the release of a child-abuse report by a psychologist. The psychologist properly reported the abuse as required by section 626.556, but then released the report to the child's mother. *Id.* In discussing the immunity granted by section 626.556, subd. 4(a), for mandated reporters, the supreme court narrowly construed the statutory immunity to include only reports made in strict compliance with statute. *Id.* at 147. The supreme court concluded that only reports made to "the local welfare agency, police department, or sheriff" were covered by immunity; despite the interest of the child's parent, the supreme court concluded that the statutory grant of immunity should be narrowly construed. *Id.*

*Bol* does not clarify whether a health record that is disclosed to a local welfare agency can also be used as a personnel record, but it indicates that the release of health records are governed by strict and narrow principles. Nothing in the MHRA indicates that health records can be released to a person's employer without specific consent. The situation is complicated here because S.F.'s employer is also the local welfare agency, but the "specific authorization in law" that permits release of the health record exists so that reports of abuse or neglect can be investigated, not to provide information to an employer. The district court erred by granting summary judgment to the county on S.F.'s MHRA claim. We therefore reverse the district court's summary judgment and remand for further proceedings.

**Reversed and remanded.**